2010-1166 PAPYRUS TECH v. NEW YORK STOCK May it please the Court, in reaching its conclusions of obviousness, the trial court repeatedly resolved factual inferences and factual disputes against PAPYRUS and acted as the fact-finder. Those disputes concern the prior art's scope and content and what the prior art teaches and suggests. Now, the chart on the back of page 8 in PAPYRUS's opening brief illustrates the prior art that is at issue with regard to… Are you talking of a particular patent? I mean, we've got two patents in play here on obviousness. Are you referring to one in particular? Yes, Your Honor. I would like to, if I could, focus on the 002 patent. Okay. And the chart on the back of page 8 concerns the prior art at issue with regard to the 002 patent. And with regard to the 002 patent, I'd like to get into three issues. The prior art's storage of volley codes, claimant's requirement for a first computer that generates sequence codes and volley codes, and the Teshiro patent, which the trial court used to invalidate six of 13 claims in the 002 patent with no advance notice to PAPYRUS. As for the storage of volley codes, the prior art's content is a factual question, and here there's a factual dispute about whether the prior art stored volley codes. Well, I thought the deal was. I mean, I don't know that anybody's disputed that, but firstly, before I start, I mean, you've marked a lot of this confidential, and it's not clear to me. I mean, a lot of this dates back to 1994. What is the basis? Because I feel constrained in terms of what I can ask you about here, given the confidentiality designations, and I just want to know what they're based on. Your Honor, I don't believe there's anything that's confidential that PAPYRUS designated. The confidential material is from NYSE or is from the Chicago exchanges. So, I don't, we asked them to de-designate it. Well, if I blurt something out, you make sure you stop me, because I, with regard to that point. Let me interrupt, or perhaps we could ask counsel for NYSE to clarify for us what the bounds are of confidentiality, so we don't inadvertently blurt something out. Yes, good morning, Your Honor. I'm Michael Murray. We took depositions of certain exchanges in Chicago, and they had some internal documents that, you know, for example, the specifications of their systems, which they continued to maintain as confidential, even though those systems were being used commercially, and I think the level of confidentiality is not very high, but nevertheless, the Chicago system's designated some of those systems as confidential under the protective order. So, I don't have the authority to disclose that. So, can we talk about TOPS and audit and all of that? Is that, can we talk about that? Yeah, we can certainly talk about it. These are systems that were used in public, were used commercially, and the, you know, the fact that they're being used is, I don't believe was designated as confidential. It is. It is. In fact, itself, but what about the specificity of the system? If you get into certain of the, of the particular messages and some of the, some of the details, I believe that the exchanges consider that to be confidential still. So, how do you expect us to write an opinion on some of this material? Well, even though, even though it's confidential, it was, it was used commercially, it still constitutes prior art. So, it's open then. So, it's not confidential. I don't think it's confidential. So, we can use everything in the record that's available and not consider it a confidential? I believe so. Were those things provided subject to a protective order that would also apply to us? There is a protective order in the case, and it's really a very small amount of the information in the Chicago system that they, they continue to maintain as confidential, so. The details, the specifics, I suppose. Some, some few specifics. I know what I, I think I know what Mr. Hamilton is going to address here, and I don't believe he's addressing anything that's confidential. All right. So, we can use the COEB stuff, the material that's available? We can talk about TOPS and audit and the CME and the CBOT? I believe that's correct, Your Honor, yes. Okay. On the 002 patent, I guess there are different, there's a lot of moving parts with respect to the analysis here on obviousness. But one of them, and correct me if I'm misstating it or misunderstanding it, is you kind of conceded or at least argued that even assuming the volley codes appear in, I guess it was in the TOPS system, they're not stored. So your view was that the prior art doesn't cover it because they weren't stored in TOPS. But you've got another reference of audit where they, they don't store volley codes, but they do store it. Why would it not have been obvious? If I'm understanding what the district court's analysis was about, why would it, I'm having a hard time finding out why it wouldn't have been obvious to combine the two. What was wrong with the district court's analysis? I'm sorry, Your Honor, in that question when you said, when you talked about audit and it, I'm not sure what you were referring to. But as far as... Tell me about the volley codes and why they're not, there's not sufficient disclosure in the prior art to at least lead to the conclusion of obviousness. Stored volley codes? Okay, if you focus on audit, the trial court decided that the packet type field in an RDP packet was a volley code. But audit did not have order packet, order packets. Audit had execution packets, it didn't have order packets. So the packet type field could not define a hierarchical relationship between order packets and execution packets. There was evidence from Papyrus's experts that the packet type field did not define a hierarchical relationship. The trial court didn't distinguish that evidence or even discuss it. That's the packet type field. If you look at one of the things that the district court did in footnote 50, the trial court confused an audit message with a TOPS message. That's in footnote 50. What page is that? It's appendix page A138, page 67 of the decision. The court believed that the exchange machine field update message was an audit message. That audit message was stored and that was incorrect. That's a factual mistake. This factual mistake contributed to the court's conclusion that audit stored volley codes and sequence codes. Also, with regard to audit, NYSE asserts that the record type field in audit was a volley code. Did the audit system have a storage provision? They could store. Audit could store data records, trade records and change records. The trade record was a record of a trade that was made. A change record was a record of changes to a trade that was sent. Audit could store those. In those stored records, there was the record type field. The trial court decided that the record type field was not a volley code because it did not adequately define the present stage of a transaction or reflect the progression of communications for a transaction. When we're looking at audit, the packet type field is not a volley code. It doesn't satisfy the definition. NYSE has cited no evidence that audit stored the packet type field. If you focus on the record type field, the trial court decided that it did not adequately satisfy the court's definition of a volley code. The third thing that the court relied upon... Didn't she combine two references to get to that? It wasn't just the audit, right? It was audit plus top? To get to the claimed invention, the trial court combined the audit... She wasn't saying it wasn't anticipated by the audit. It wasn't a single reference. It was a combination of references that led to the obviousness conclusion, right? That's correct, Your Honor. What's significant about whether the prior art stored or didn't store volley codes is whether this case is like KSR where each element in the claim is found somewhere in the prior art or whether it's not like KSR. The way the trial court analyzed this, it's as if it was a case like KSR. We believe that there's a factual dispute as a minimum about whether there were stored volley codes in the prior art. Going back to your initial statement on page 7, that table, the judge indicated that there was a step 9, 877 claim. I'm sorry, Your Honor? 877. Oh, yes, Your Honor. At the table. Right. The one you started off with on page 8, there's a 877 claim listing, claim 9. It says audit trail creation. She refers back to the PAR workstation CBO and ORS CBOE. Now, where is she wrong in that? Why is she wrong in analyzing it on that basis? I'm sorry. I may not have understood your question. Are you talking about the first paragraph on page 8? I'm talking about page 7 on the table. Oh, that's with regard to 877? No, she has a table, and you have a table here showing on page 7 a listing of the claims, 877 claims. Yes, Your Honor. And she refers back to the audit comparison. For instance, on number 9, this is the audit trail creation. That's a claim element. Right. And it says PAR workstation CBO and ORS CBOE. Yes, Your Honor. Now, why is she wrong in making that analysis as a prior art discussion? I don't believe it's McIvers' position that the court, with regard to the 877, improperly analyzed many of these references. I think when you look at what the trial court ultimately did when concluding that the subject matter of 877 claim 1 was obvious was to rely upon the Sicily patent and the CBOE equipment. So what the trial court did was basically go through the claims, find where each piece of prior art might have had the first claim element, where each piece of prior art might have had the second claim element. And then that's what the trial court did in its discussion. But ultimately, with regard to reaching a conclusion of obviousness, the trial court relied upon the CBOE system and the Sicily patent. And we believe that there's a factual issue, at least, about whether the prior art contained a program computer that simultaneously displayed current status information about individual instructions. And that's the missing limitation that you say is for the 877 patent and the prior art, right? That's correct, Your Honor. And that's why the analysis that the trial court did— So tell me what— Go ahead. So you're saying what's missing is automatically and simultaneously displaying the program computer in real time, displaying the current status of information about—I mean, it seems this is a novel concept. This is something novel. Well, I think— It's contained in here. Do you want to talk me through this or explain to me what this limitation actually means? Well, yes, Your Honor. If you can compare the figures on pages 64 and 67 of Papyrus's opening briefs, I'll try to explain. Okay. So on page—you're on page 64? Correct. This is what the NYSC relies upon as showing the display of information about various workstations. This is CBOE equipment. It's the PAR server's workstation control screen. What this screen shows is the total number of orders at a given workstation. And that's not what 877 Claim 1 requires. Well, tell me what the automatically and simultaneous displaying language requires. That's what you say is missing. Yes, Your Honor. If we can look at page 67 of Papyrus's brief. And there what you have is the simultaneous display of current status information about three individual instructions. There's an IBM order. There's a Philip Morris order. And there's a DEC order. And that's the kind of display that we maintain the prior art was lacking. Okay. Can you look at the Sisley patent at column 7? Which lines in column 7? 736 through 45. The end of the paragraph that begins, the clock 32 serves as a source of real-time for use in evaluating. Maybe I'm not understanding it. That's quite possible. But I'm having a hard time understanding why this doesn't disclose the same automatic, simultaneous, and real-time limitation that is in the 877 patent. All right. The way the 877 patent works is information comes back from the floor broker. It's sent, transmitted wirelessly. And then the display that we looked at on page 67 is automatically updated in real-time to reflect the change in the orders. Now, Sisley works completely differently. Sisley, there's field service technicians. And there's no disclosure of how field service technicians may communicate their status as to how they're progressing on their assignments. Sisley just doesn't disclose that. And also – Where is that in the language, though? The language doesn't seem to compel them. I mean, you're describing it to us, but the language itself simply says, automatically and simultaneously displaying in real-time the current status of information to a device. That seems to me to – I mean, maybe Sisley does it in a way other than the way you do it. But there's something in the language that indicates that, right? Are you saying that Sisley does do the same thing, they just do it in a different way? No, Your Honor. I think that the language regarding delegated instructions in the displaying step, that's what requires the – well, that's what requires the simultaneous display of information about one order and another order and a third order, if that's available. Now, if I could just briefly talk about the Shiro patent, since I'm running out of time here. You're already out of time, but it's all right. We'll give you some more time. Okay. Go ahead. What? Let's talk about the Shiro patent. Yes. After the summary judgment motions were fully briefed, the trial court asked the parties about the relevance of multiplayer game technology to the 877 patent, but not the 002 patent. NYSC then cited or submitted the Shiro to the trial court and argued its relevance to the 877 patent, but not the 002 patent. Nevertheless, the trial court used it to invalidate dependent claims 3 to 5 and 10 to 12 in the 002 patent. And as a result of this lack of advance notice, Papyrus did not have a full and fair opportunity to address the validity, the obviousness of the 002 patent claims in view of the Shiro. Thank you. Can I just ask one sort of procedural question? You've appealed some of the claim construction, correct? Yes, Your Honor. Assume hypothetically we were to send one or both of these patents back for, you know, trial or at least for a relook at summary judgment. Do we have to decide, is it necessary for us to decide the claim construction questions? Well, if it's the 002 patent that goes back, I think it would be necessary on that. Because at least for claim 8, the construction that Papyrus advances is a little bit broader than the construction that the trial court adopted. Which claim construction was claim 8? Claim 8 has two computers, and the trial court decided that the same data structure had to be in both computers. And we maintain that different data structures can be in the two different computers. That's what the word A means, right? Yes, it revolves around that. Yes, Your Honor. Is that singular or plural? Thank you. We'll restore three minutes of your time. Could you add three minutes to Mr. Murray's time so it provides for equal time to both parties? Mr. Murray, whenever you're ready. May it please the court. Your Honor, there really is no factual dispute regarding the 002 patent. What about the storage of the volley codes? The volley codes, first of all, Papyrus has not denied that volley codes were being used in the top system. The exact volley codes, in fact, that are disclosed in the preferred embodiment of the 002 patent. In particular, the TOPS calls it message type. Now, these message type volley codes were contained in the header of these messages. So these order and execution data packets that were admittedly being used in the TOPS system well before Papyrus' invention disclosed each of the elements of the claimed data structure. So Papyrus thinks it's entitled to a patent for merely taking data packets that were used in the prior art and putting them into a memory. And that clearly would have been obvious in 1993. The district court found, first of all- Obvious based on any reference or obvious just based on common sense? There are several reasons that would have been obvious. First of all, the CME's documents are clear that these messages are, quote, entered into the exchange systems database. That's a quote from a CME document. That's at page A24597 in the appendix. So Papyrus doesn't dispute that these messages are entered into the CME's database. Papyrus says, well, we don't know exactly how those messages were entered into the CME's database. That's their argument. And the district court said, well, the simplest way to enter the messages into the database is to take the messages and just put them in a database. Just store them as they're transmitted. And if you merely do that, then you have exactly what's recited in the 002 patent claims. Because these order and execution data packets that were used in TOPS are exactly the same as the data packets claimed in the 002 patent. The only argument from Papyrus is that somehow it's an invention to take them and put them into a memory. There's also significant- What about the- there was conflicting testimony, right, on this hierarchical relationship, right? I mean, wasn't that- there's some conflict on the facts on that, what the prior art taught? No, I don't believe there's any conflict in terms of what the prior art taught. For example, the message type in the order data packet, it's clear that there were different message types like order, order correction, and order cancel. These are the examples of volley code that are contained in the 002 patent. The hierarchical relationship comes from order cancel being- has to come later than order. You can't cancel an order until you have an order. So that's what they mean by hierarchical relationship. It's sort of a higher-level message. It has to represent sort of fresher data. That's the hierarchical relationship. Does that always have to occur later? Order cancel would always have to occur after order, Your Honor. After the order's been submitted. Because first there has to be an order on the exchange, and then that order might be later canceled. The same thing with the execution messages. Is that defined in that particular manner? It is defined. That's at page A21538 in the specification. Which patent? We're talking about the 002. We're talking about the 002 patent. 002 patent. So the interface specification, which defines what's going on in the TOPS system, specifically defines these different message types for orders and for executions. And there's a clear hierarchical relationship there. So the hierarchical relationship is clearly in the prior art. The Volley codes for orders and executions are clearly in the prior art. And the only argument that we're getting from Papyrus is, well, it was an invention to store it, to put it into a memory. And that simply is not an invention, to store what was in the prior art. And there's plenty of motivation in the prior art to do this kind of storage. This is one of the most monitored environments on Earth. And there's powerful motivation to keep very accurate records of everything that happens in an exchange floor. The background of the invention specifically says that you have to have a clear audit trail. It was known that you have to have an audit trail, because sometimes there are disputes about what happened on the exchange floor. And you need to be able to go back and recreate everything that happened. Further, the CFTC report cited by Papyrus discusses the Futures Trading Practices Act of 1992, which was an act that actually mandated audit trails on these exchange floors, because brokers were playing games. When a big order would come in, a broker might sort of buy some of that, let's say, security for his own account, knowing that the price was going to get driven up. So the 1992 act was mandating that these exchanges have very accurate records about everything that happened on the exchange floor. That's powerful motivation to keep accurate records and to store these messages. So we think there's clear motivation, both in the 877 patent background and in the CFTC report, the 1992 act, to store these messages. You're talking about the 002 patent, not the 877. Yes, we're still talking about the 002 patent. Because the 002 patent is simply about storing an order packet and an execution packet. Now, I'd like to address a couple of the other arguments Papyrus has made on this issue of storage. Papyrus has said, well, common sense at the time would dictate that you don't store these messages, because memory resources were very limited. Well, that's just not accurate, and it's not a fact that's genuinely in dispute. But Papyrus's expert, Dr. Haller, in his expert report said, quote, 16,000 packets could be stored in an off-the-shelf piece of equipment, a Fujitsu piece of equipment that was available in 1993. He further said, quote, for a small additional price, a card could be plugged into the Fujitsu device to provide an electronic disk capable of storing an additional 30,000 packets. This is the rebuttal expert report of Dr. Haller at A22794, which is volume 21 of the appendix. So the claim requires the storage of just two data packets, one order data packet and one execution data packet. And that's it. And Papyrus's expert is here admitting clearly that 46,000 packets could be stored in inexpensive, off-the-shelf equipment that was available in 1993. There's just no genuine dispute here that computer resources in 1993 were more than sufficient to store this order and execution data packet. And that, combined with the strong motivation to store this information, is sufficient for the summer judgment of obviousness. Also on this issue of common sense and storage, even if Papyrus was correct that because computer memory was so expensive in 1993 that you wouldn't want to store these messages, that's really irrelevant to the obviousness inquiry. And the KSR decision explicitly warns against allowing market forces to impact an obviousness decision. So if market forces, if cost kind of impediments would have discouraged the person of ordinary skill and the art from doing something, you don't get an invention later for doing it when the costs, when the market forces have changed. There needs to be a technical impediment to having done it in 1993. There's no technical impediment here. You just take these messages and put them into a memory. Papyrus has also argued that the claim requires storage in a particular way. This is language that is in their brief repeatedly. But the claim required, the particular way that's actually recited in the claim is as a data packet. So all the claim says is you have an order data packet, you have an execution data packet, and you put those data packets into a memory. That's the particular way that's recited in the claim. And that's exactly the particular way that these messages were organized in the top system. They were organized as data packets, order and execution data packets, and that's not disputed. I'd like to address a couple, unless there are other questions about 002, I'd like to address a couple of points about the 877 patent. Again, there's no factual dispute here, and I would point the court to Papyrus's response to NYC's statement of undisputed facts, which is in the record at A18725 through 789. These are the facts relating to the CBOE system. And fact after fact is uncontroverted by Papyrus. They don't controvert the facts relating to the CBOE system and how it operated. And the CBOE system was an electronic system that provided displays to people on the floor of the exchange that are remarkably similar to the displays that Papyrus is claiming in the 877 patent. The booth clerk at the CBOE was provided with a display that allowed the booth clerk to look up information about orders. There's even a more relevant display at the CBOE, which is known as the par server display, which Mr. Amundson was referring to before. And that par server display does exactly what the claim says. It has information that indicates whether or not the instructions are pending. That's all the current status information means. The Markman decision from the court, which has not been challenged, is current status information is, quote, information indicating whether an instruction is pending or not pending. That's all that it means. And that display, that par server display- I thought the par server dealt with information about the floor activities, not about the instructions. Right. And that's exactly what's claimed in the 877 patent, is that the display is showing you what's going on on the floor. Well, it talks about instructions in the 877, not floor activities, right? Well, the instructions are orders that go out to the brokers. So the instructions here are- the most common example of an instruction is an order that goes out to the broker on the floor. So what you have here is you have a booth clerk that is going to try to decide who's going to get the next order. And in order to make that decision, the booth clerk obviously needs to know, well, who's busy and who's not busy. That's all this claim is about. And that's what these instructions are. So the system provides information automatically back to some display that can be used by a booth clerk that will educate the booth clerk about what's happening on the floor of the exchange. What's the status of these instructions? Are they pending or are they not pending? That's what current status information means, whether the orders, for example, are pending or not pending. And the PAR server display does exactly that. The only difference between the CBOE system and the system that's claimed in the 877 patent is that the CBOE, the booth clerk, wasn't the person that made the selection. Because the duties of a booth clerk differed from exchange to exchange. So in the CBOE system, the booth clerk monitored the orders that were out on the floor and reported back, but didn't make a decision about who's going to get the next order. But in other exchanges, like the NYSE, the booth clerk did make that selection. So in some exchanges, the booth clerk made the selection. In others, it didn't. And Papyrus admits in the background that it was known that booth clerks could make this kind of a selection. So when you modify the CBOE system such that the booth clerk makes the selection, which is well known, admitted in the 877 patent, you naturally are going to give the booth clerk the most relevant information that the booth clerk needs in order to make that selection. And the CICELI patent teaches us exactly that. Figure 10 in the CICELI patent shows a screen that provides information to the person making the selection, the person making the decision. And that screen shows, for a number of field service technicians, how many pending orders those field service technicians have. In particular, figure 10 shows, for example, field technician A has three pending orders, and field technician B has two pending orders. And it certainly is obvious and is well known in 1993 that you provide this kind of information to the person that's going to make the selection. So this provides motivation to provide the most relevant display to the person at the CBOE who's going to make the selection, which would be the booth clerk. I'd like to address the argument that Mr. Amundson made about Tashiro. Let's talk a little bit about Tashiro. Is Tashiro an analogous art? I believe it's clearly an analogous art. Why? Well, because it's really something that someone of skill in the art would naturally look to. What's important in these systems is not the data that's being displayed. It's the interconnection of these systems and the networked computers. So someone of skill in the art in 1993 who is, let's say, setting up a computer network on the floor of an exchange where you need this data coming in and you need to have this real-time data, they naturally would look to other similar network computers that were well known at the time. Would you go to a game arcade to do that? No, but as an engineer, you certainly would be aware of that, and you would borrow from that closely analogous field where you have networked computers, where you're trying to draw in information from multiple computers and display it in real time. That's pretty broad, though, isn't it? That's a pretty broad search at that point. What would lead you to that? Just common knowledge of someone of ordinary skill in the art or someone who's played arcade games looking at it from a perspective of, ah, there's a solution to my problem. I think that engineers at that time are educated about networks generally. They're not educated. You don't become an engineer focused on exchange technology. You become an engineer or a computer scientist learning about network systems, learning about how you can get data from multiple computers to display on one computer. So, I don't think that it would be appropriate to limit someone of ordinary skill in the art to just the exchange environment. You're not claiming that there's anything special about the gaming area that provides some teaching or credibility that's germane here. It's just that gaming is one of perhaps dozens of different kinds of networking systems that provide some teachings that would be relevant. Yes, Your Honor, exactly. It was a ubiquitous type of system at that time that brought in data from multiple sources and displayed it. So, if I'm an engineer being hired to set up such a system on an exchange floor, I'm naturally going to look at other well-known network systems that brings data in from multiple locations and displays them. But your colleague tells us that he didn't have notice to respond to that, that you used that reference with regard to the 877 and then the district court turns around and uses it for the 002. Is that correct? Well, that is what happened, but the 002 is a continuation of the 877 patent. These patents have nearly identical specifications. So, I don't think that it should have been too shocking that when the district court said, well, I'm interested in looking at the gaming art in relation to the 877 patent, that she might also apply it to the continuation of the 877 patent. The 877 was the parent. that Judge Barsley mentioned in her letter to counsel. And we responded, and Papyrus, we both had the same opportunity to respond to that. And we said, yeah, we think that it clearly is relevant because you have these network computers, et cetera. So, I don't think that they were blindsided by that being used in the 002, which is, again, has almost the same specification. And I'd also like to point out that Tashiro is not at all necessary to uphold the judgment of the district court. We didn't rely on Tashiro because we think there's actually more relevant prior art. The CME system was doing this data validation. What the claims are about that the Tashiro reference was applied to are about validating messages coming into the system. And the very similar data validation techniques were being used at the CME, really more closely related than Tashiro. So, we don't think that it's at all necessary for this court to resolve the issue of whether Tashiro is analogous art or not. I think it clearly is analogous art, but you don't really need to get to that issue because the CME certainly has, for example, the- Let me ask you about one point. Well, your time's about to run out. We've got precedent. I think the case is TRIMED that talks about common sense. And I think part of what TRIMED says is that just sort of throwing around the term common sense isn't sufficient. That you need to sort of explain the applicability of common sense. In your view, was the district court's use of common sense, which she did frequently in her opinion, was that sufficient? Did she sufficiently explain the common sense aspect of that under the guidance of TRIMED? I think she certainly did. And as I've explained, the minor changes you need to make to these prior art systems to get to the claimed invention, there's specific motivation, specific reasons in the prior art to make these changes. In the 877, the Sisley patent, teaching to provide the display to the person making the selection. In the 002 patent, you have powerful motivation to store these messages that were admittedly in existence at the CME. So there's specific motivation and reason in the prior art to make the modifications that you need to make. So it's not that Judge Bosley just kind of waved her hands and said, well, this is all common sense. There's plenty of actual evidence in the record here to find that the minor changes that you need to make to these systems would have been obvious in 1993. Thank you, Mr. Murray. Thank you. Mr. Munson, you have three minutes. Thank you. With regard to Mr. Murray's last argument about TOPS, CME's equipment TOPS, suggesting the subject matter of dependent claims 3 to 5 and 10 to 12, our briefs explain that there's at least a disputed issue of fact about whether TOPS would suggest the subject matter of those claims. For example, some of the claims, I think it's claims 3, 5, 10, and 12, require use of the highest hierarchical level previously stored for a sequence code when comparing packets. NYSE has not cited any evidence that TOPS checked a hierarchical level when comparing packets. Now, moving on to Tashiro and whether Tashiro would be analogous art. The trial court found, decided, that Tashiro was not within the same field of endeavor as the papyrus patents. So what's left is a question whether Tashiro is reasonably pertinent to the problem facing the inventors. So for dependent claims 3 to 5 and 10 to 12, they require use of a sequence code for packet validation purposes. Tashiro doesn't disclose any order packets, doesn't disclose any execution packets, and doesn't disclose any sequence codes. Also, with regard to Tashiro, during prosecution of papyrus's patents, there was no reference cited by or to the patent office that concerned multiplayer game technology. NYSE's experts did not rely on any reference relating to multiplayer game technology in any of their expert reports or in any of their depositions. Does that mean, though, that game technology did not be an analogous art? Well, no. I just want to point that out. It seems like if it were as relevant as Mr. Murray says, maybe someone would have come up with a multiplayer game patent or publication a little earlier in the game. With regard to whether common sense would suggest storage of certain information, an entire message as transmitted, page 24 of papyrus's opening brief quotes from NYSE's expert. And it's NYSE's expert who says that because of memory limitations of handheld devices at the time, a person of ordinary skill in the art would have recognized it was common to minimize the amount of data stored in these devices. Also, as a last point, if you look at the claim language with regard to hierarchical relations— How does that help you? Just because it's common to minimize the amount of data stored in these devices, how does that discount the point that the other side was making? All right. Atop's messages included information that was not needed for use later on, such as information in the message header. That's where the message type field that we're talking about as a volley code appears. So, an ordinarily skilled artisan would not have wanted to store unnecessary data because that would have taxed memory resources and slowed processing speed. Thank you.